UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF MICHIGAN

In re:

STEPHEN LUDWIG VANDER HOFF,

      Debtor.

Case No. 21-01002-swd
Hon. Scott W. Dales
Chapter 7

_____/

GREENSTONE FARM CREDIT SERVICES,
ACA and GREENSTONE FARM CREDIT
SERVICES, FLCA,

Adversary Pro. No. 21-80088

      Plaintiffs,

v.

STEPHEN LUDWIG VANDER HOFF,

      Defendant.

_____/

FINDINGS OF FACT AND CONCLUSIONS OF LAW

PRESENT:    HONORABLE SCOTT W. DALES
              Chief United States Bankruptcy Judge

I. INTRODUCTION AND JURISDICTION

This adversary proceeding is the latest of several lawsuits between Stephen Vander Hoff

(or his dairy), and his agricultural lenders, GreenStone Farm Credit Services, ACA and

GreenStone Farm Credit Services, FLCA (collectively "GreenStone").  By the time GreenStone

filed the complaint in this adversary proceeding, it had already obtained a judgment from the

Hillsdale County (Michigan) Circuit Court (the "Judgment") against Mr. Vander Hoff and the

dairy and liquidated most of the property of both.  GreenStone seeks the last remaining form of

relief available, namely a declaration that the Judgment memorializes a debt that should be excepted from discharge under 11 U.S.C. § 523(a)(2)(B).[1]

An adversary proceeding to determine the dischargeability of a debt is a statutory core proceeding over which the court has full authority to exercise the subject matter jurisdiction the U.S. District Court referred under statute and local rule.  28 U.S.C. § 157(a) (referral) and (b)(2)(I) (determinations as to the dischargeability of particular debts); 28 U.S.C. § 1334(b) (subject matter jurisdiction); W.D. Mich. LGenR 3.1(a) (referral).

The court tried the remaining issues in Kalamazoo, Michigan, on December 15, 2022.  Both parties appeared through counsel.  The parties offered the testimony of three witnesses and highlighted nine documents.  The parties agreed that the facts recited in the fourth paragraph of a stipulation erroneously titled "Joint Final Pretrial Order" (ECF No. 31 at ¶ 4) were admitted for purposes of the trial.  In addition, although they agreed at the final pretrial conference to admit the exhibits identified in the same ECF No. 31 at ¶ 9(1)-(16) for all purposes at trial, the trial testimony focused on just a subset of those documents.

The following constitutes the court's findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052 and Fed. R. Civ. P. 52.

## II. ANALYSIS

### A.  Statutory Framework

This case involves statements that Mr. Vander Hoff made in connection with financing his family's dairy farm, Vander Hoff Brothers' Dairy (the "Dairy").  The Plaintiffs' single-count complaint relies on § 523(a)(2)(B), which provides in relevant part as follows:

---

[1] The Bankruptcy Code is set forth in 11 U.S.C. §§ 101 *et seq*.  Specific sections of the Bankruptcy Code are identified herein as "§ ___."

A discharge under section 727 … of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

…

(B) use of a statement in writing—

  (i) that is materially false;

  (ii) respecting the debtor's or an insider's financial condition;

  (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

  (iv) that the debtor caused to be made or published with intent to deceive …

11 U.S.C. § 523(a)(2)(B).

GreenStone, as the party seeking to limit the scope of Mr. Vander Hoff's discharge, must shoulder the burden of proof on each element of the case—a point its counsel conceded during the trial. *Rembert v. AT&T Universal Card Services, Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998).

## B.  Findings of Fact

Before trial, the parties stipulated to facts supporting the majority of GreenStone's case. *See* Final Pretrial Order dated Oct. 13, 2022 (ECF No. 33).  For example, the parties stipulated to the following facts which the court adopts as part of its findings:

- Mr. Vander Hoff is an insider of the Dairy.

- The statements upon which GreenStone relied are in writing.

- The statements consist of a financial statement dated December 18, 2014 ("Statement"), the Dairy's accountant's independent report ("Report") which used material provided by

the Dairy, as well as loan applications ("Loan Application") and a balance sheet ("Balance Sheet").

- As of December 31, 2014, the amount the Dairy owed to Synergy Feeds was approximately $106,000 plus $15,000.

- This amount increased during the summer of 2015, and before GreenStone made its loan to the Dairy, as evidenced by the Synergy Feeds mortgage, and the Synergy Feeds Note in the amount of $200,000.

- The financial statements bearing Mr. Vander Hoff's signature show that he adopted (and therefore made or published) these statements, even if GreenStone augmented or generated the statement based on the Dairy's information.

- Mr. Vander Hoff failed to disclose the Synergy Feeds debt to GreenStone at the time GreenStone made the loan.

- Prior to GreenStone making the loan, Mr. Vander Hoff failed to disclose to GreenStone the mortgage he granted to Synergy Feeds.

- The Statement, Report and Balance Sheet provide a profit and loss statement, balance sheet, and accounts receivable aging summary, all of which related to the Dairy's overall financial condition and these documents qualify as statements respecting financial condition within the meaning of § 523(a)(2)(B).

- The referenced statements contain historical information regarding the Dairy and include a schedule of feed expenses for 2014.

At trial, GreenStone sought to establish the balance of its case, namely that it reasonably relied on a false financial statement that Mr. Vander Hoff signed on behalf of the Dairy, and that his scienter when executing the statement renders the resulting debt non-dischargeable.

GreenStone presented its case through the testimony of two employees, its vice president, Nicole Ladd, and a senior credit officer, Eric Krummen.  Ms. Ladd handled the Dairy's account in the early days of the parties' lending relationship before transferring the matter to Mr. Krummen, who assists GreenStone in addressing non-performing loans.

Ms. Ladd testified credibly, knowledgeably, and confidently about her meetings with Mr. Vander Hoff, when the Dairy first considered refinancing its existing PNC Bank debt in December 2014.  She remained involved with the Dairy through the loan closing in October the next year, working with the underwriting department to evaluate the proposed refinancing, based on the Dairy's financial information that Mr. Vander Hoff supplied to her.  Even after the refinancing closed, Ms. Ladd remained in contact with Mr. Vander Hoff for a few years, not socially but simply professionally, monitoring the account until the Dairy defaulted and Mr. Krummen from the workout department got involved.  Ms. Ladd has many years of experience as an agricultural lender, first at Southern Michigan Bank & Trust and later at GreenStone.

She testified at some length about the "Five Cs" of agricultural lending: (1) character; (2) capital; (3) capacity; (4) collateral; and (5) conditions.  She stated that her prior employer used the same lending framework, and that throughout her career, presenters at continuing education programs regularly referred to the Five Cs.  Lenders evaluate the first "C," for "character," typically by reviewing credit reports to check payment history.  The second, "capital," according to Ms. Ladd, routinely involves calculation of a financial ratio referred to as the "owner's equity position" or "owner's equity percentage."  GreenStone calculates this ratio by subtracting a borrower's total liabilities from assets, dividing the difference by the total assets, and expressing the quotient as a percentage.  A borrower's "capacity" (the third "C") implicates cash flow—more specifically, whether operations generate cash sufficient to meet obligations.

The fourth "C" – "collateral" – obviously refers to property a borrower agrees to encumber as security for a loan, in this case, the Dairy's real estate in Branch County.

The final "C," according to Ms. Ladd, refers to any "conditions" that GreenStone (and other lenders) might require as a condition of making a loan.  As an example, Ms. Ladd testified that GreenStone generally requires an owner's equity position (addressed as part of the second "C") of at least 50% to make an ordinary loan without a special "condition," such as a federal guaranty from the Farm Service Agency or "FSA."  In other words, a lender might attach a condition to making a loan to compensate for a borrower's shortcomings on one of the other "C" factors.

Ms. Ladd testified that, in her experience based on employment with GreenStone and Southern Michigan Bank & Trust, as well as continuing professional education over the years, agricultural lenders generally make underwriting decisions based on the Five Cs, and that GreenStone followed this industry standard in refinancing the Dairy's debt.

Ms. Ladd's testimony was loud and clear on whether Mr. Vander Hoff's omission of the Synergy Feeds debt and mortgage from the Dairy's financial statements affected GreenStone's decision: it most certainly did.  The omission of the debt affected at least three of the Five Cs. First, omitting the Synergy Feeds debt affected the "capital" aspect of the Five Cs by producing a ratio of approximately 51-55 %; including the debt, however, dropped the ratio to approximately 47.3 %—below the threshold.  Second, GreenStone's ignorance of the debt affected its evaluation of the Dairy's cash flow. According to GreenStone's witnesses, an intermediate term debt, such as the debt to Synergy Feeds represented by the note (as opposed to the revolving debt), would strain the Dairy's "capacity" or cash flow by requiring an additional $25,000-$30,000 per year in payments to retire the debt within the five years typically associated with intermediate term debts.

Moreover, by failing to disclose the Synergy Feeds debt, Mr. Vander Hoff prevented GreenStone from considering whether to require additional conditions, such as the FSA guaranty that, according to Ms. Ladd, would have avoided approximately 90-95 % of GreenStone's loss on the Dairy account.  Instead of suffering a loss of approximately $900,000, GreenStone would have lost about $50,000.

As for the Dairy's collateral position, the credible testimony of both GreenStone witnesses established by a preponderance of the evidence that GreenStone would not have made the loan as it did if Mr. Vander Hoff had disclosed to Ms. Ladd the existence of the mortgage that Mr. Vander Hoff granted to Synergy Feeds a few weeks before making the certifications of the loan application (Plaintiffs' Exhibit 4) that the financial statement (which omitted the mortgage) was complete and accurate as of August 6, 2015.  Ms. Ladd testified that GreenStone's own lender (AgriBank) required GreenStone to have a first position, and Mr. Krummen's testimony was to similar effect, going so far as to state, plausibly, that a first lien position is a federal regulatory requirement. [2]

Mr. Vander Hoff's testimony did little to undermine GreenStone's *prima facie* case, and in some particulars, fortified it.  For example, although he denied that he intentionally omitted the disclosure of the Synergy Feeds debt, he did concede that omitting the mortgage was a "big deal." *See* Transcript at 174:18-20.  His counsel went to great efforts to show that Mr. Vander Hoff did not conceal the Dairy's substantial feed expense paid to Synergy Feeds in 2014, and much of the debt was revolving debt akin to utility and payroll debt that, counsel suggested, was also omitted but likely known to GreenStone.  The argument, however, mixes the proverbial apples and oranges in at least two ways.  First, an expense (revealed in the income statement as such) is not the same

---

[2] *See* 12 C.F.R. § 614.4200(b)(1) ("Long-term real estate mortgage loans must be secured by a first lien interest in real estate, except that the loans may be secured by a second lien interest if the institution also holds the first lien on the property.").

as a debt (typically reflected on a balance sheet).  The disclosure of the former does not invariably imply the latter.  Expenses, if unpaid, may give rise to debts, but the two are conceptually distinct. Second, the testimony established that, in Ms. Ladd's experience, dairy farmers typically pay for feed on a "cash on delivery" basis, or within 30 days, giving rise to, at most, short-term debt.  *See* Transcript at 55:5-11.  The court infers, therefore, that even a very large annual feed expense may not show up on a balance sheet if promptly paid, as was evidently the custom in the local dairy business, or it would appear as part of short-term debt (like accrued payroll or income taxes or utilities), as Ms. Ladd's testimony on cross examination in the Debtor's case suggests.  *See* Transcript at 185:19-189:25.

It is also worth addressing Mr. Vander Hoff's insistence that approximately $130,000 in concealed feed expense was an omission of just one month's feed.  *See* Brief: Defendant's Closing Argument, p. 9.  According to Mr. Vander Hoff's Schedule of Feed Expense for the Year End December 31, 2014, the Dairy listed approximately $526,391 in annual feed expense.  *See* Transcript at 39:24-40:5.  Dividing that by 12, the Dairy's average monthly feed expense for 2014 was approximately $43,866—nowhere near $130,000, as Mr. Vander Hoff suggests.  Furthermore, while the court recognizes that each month's feed expense is likely to fluctuate depending on various factors (e.g., time of year, reproductive cycles), the court is not persuaded that a single month would comprise approximately 25% of the Dairy's annual expense.  The court rejects Mr. Vander Hoff's effort to soft-pedal the omission of the Synergy Feeds debt as a mere month's feed expense or veritable rounding error on the merits but also given his stipulation about the materiality of the omission.

On a separate note, despite Mr. Vander Hoff's concession at the commencement of the trial that he failed to disclose material information about the Synergy Feeds debt when applying for the

loan at issue in this adversary proceeding, both parties appeared to direct most of their efforts during trial on the materiality element of the case.  For its part, GreenStone focused its efforts on establishing that if the lender had known about the Synergy Feeds debt when its credit analysts calculated the "owner's equity position," the calculation would fall below 50% (a key lending criterion according to GreenStone's witnesses).  A percentage below 50% might doom, or at least alter, the extension of credit.  For example, as just noted, Ms. Ladd credibly testified that when the ratio dips below 50%, GreenStone and other lenders (including her former employer) consider requiring a credit enhancement such as a federal guaranty from the FSA.

From the defense side, counsel doggedly focused on getting GreenStone's witnesses to concede (as they eventually did, with caveats) that GreenStone does consider extending credit to borrowers whose owner's equity ratios dip below the 50% threshold, arguing (perhaps contrary to the stipulation regarding materiality),[3] that the ratio may not have been material to GreenStone's decision to lend to the Dairy.  Mr. Vander Hoff seems to be arguing, therefore, that his failure to disclose the Synergy Feeds intermediate term debt (which affected the owner's equity position calculation) renders GreenStone's reliance on that percentage target unreasonable.

The court rejects the argument because, even ignoring the limited role that a creditor's reliance plays in controversies under § 523(a)(2)(B),[4] Mr. Vander Hoff's unequivocal statements at the start of the trial that the omission was material constitutes a judicial admission that removed the question of materiality from the controversy.  *See In re Wood*, No. 22-8003, 2022 WL 17607099, at *7 (6th Cir. B.A.P. Dec. 13, 2022) (discussing judicial admissions).  As noted throughout, Mr. Vander Hoff stipulated to the materiality of the Synergy Feeds debt before trial,

---

[3] The court acknowledges a link between the materiality element of § 523(a)(2)(B)(i) and the reasonable reliance element of § 523(a)(2)(B)(iii)—it is doubtful whether a lender may ever reasonably rely on immaterial information.
[4] *See infra* pp. 11-12 (discussing *Woolum*).

ultimately preventing him from arguing that the debt was immaterial as a way of establishing GreenStone's allegedly unreasonable reliance.

### C.  Conclusions of Law

This adversary proceeding follows Plaintiffs' filed complaint, seeking to except its debt from discharge pursuant to § 523(a)(2)(B).  To succeed on a *prima facie* case under § 523(a)(2)(B), a Plaintiff must prove that it reasonably relied on a written statement, respecting the debtor's financial condition, which was material to providing the debt and was published with the intent to deceive the creditor.  At the outset, the court notes what is not in dispute: Mr. Vander Hoff's failure to disclose the Synergy Feeds debt and mortgage at the time GreenStone made the loan and that the omission was material to GreenStone's approving the subject loan.  Mr. Vander Hoff specifically concedes that GreenStone was not aware of the Synergy Feeds debt at the time the loan closed, and that the financial statements bearing his signature show that he made or published the statement.  At the commencement of trial, in response to the court's question about the absence of any discussion of materiality in Mr. Vander Hoff's trial brief, his counsel stated that his client concedes that the omission of the Synergy Feeds debt was material.

Therefore, the remaining questions are whether GreenStone reasonably relied on the financial statements in making the loan, and whether Mr. Vander Hoff intended to deceive GreenStone when he shared the statements, given all the underlying circumstances surrounding the transaction.

Taking up the first question first, courts and commentators have opined that the reasonableness of a creditor's reliance under § 523(a)(2)(B)(iii) is determined by a totality of circumstances, including (among others) the following:

1. Existence of prior business dealings between the parties;

2. Whether any warnings would have alerted a reasonably prudent person to the debtor's misrepresentations;

3. Whether minimal investigation would have uncovered the inaccuracies; and

4. The creditor's standards for evaluating creditworthiness and the standards or customs in the industry.

*In re Sansom*, 224 B.R. 49, 55 (Bankr. M.D. Tenn. 1998) (citing 4 Lawrence P. King, Collier on Bankruptcy ¶ 523.08[2][d] (15th ed.1998)).  Ms. Ladd reported that Mr. Vander Hoff or the Dairy had a "small mortgage that was just being paid over time" before seeking the refinancing at issue in this adversary proceeding.  *See* Transcript at 21:25-22:5.  The witnesses identified no "red flag" signaling a need for heightened scrutiny.

Mr. Vander Hoff's challenge to GreenStone's reliance on the Owner's Equity Position target of 51% invites precisely the sort of judicial scrutiny of lending standards that the Sixth Circuit long ago rejected as beyond the court's role: "a bankruptcy court's determination of reasonable reliance is not 'to undertake a subjective evaluation and judgment of a creditor's lending policy and practices.'"  *In re Woolum*, 979 F.2d 71, 76 (6th Cir. 1992) (quoting *In re Garman*, 643 F.2d 1252, 1256 (7th Cir.1980), *cert. denied*, 450 U.S. 910 (1981)).  Instead, in our circuit, the requirement is designed to preclude lenders who advanced credit in bad faith from turning the tables on the borrowers who participated in the transaction.  *Id.*

> The present issue for the court is simply whether the bankrupt obtained credit, or a renewal, through the creditor's reliance on a materially false financial statement containing information apparently sufficient to obtain an accurate picture of the debtor's financial condition with regard to a reasonable decisional factor in the loan decision, filed by the debtor with the intent to deceive the creditor. The creditor need establish only its reliance in fact, although its claims to reliance cannot be so unreasonable as to defeat a finding of reliance in fact. Given this reliance, the court, with the benefit of hindsight, should not base its decision regarding discharge on whether it would have extended the loan.

*Woolum*, 979 F.2d at 76.

In the present case, the evidence clearly establishes that the industry standard in evaluating a farm or dairy for a loan included an analysis of the Five Cs. The evidence further establishes that GreenStone conducted such an analysis when contemplating whether to fund the Dairy's loan, relying on the information provided to Ms. Ladd by Mr. Vander Hoff (which did not include the Synergy Feeds debt) and other due diligence measures. Lenders typically rely on self-reporting by agricultural borrowers of their financial information. Save for Mr. Vander Hoff's omission and a clerical error at a title company, both of which were out of GreenStone's control, GreenStone would likely not have made the loan that the Dairy ultimately received. In fact, both GreenStone witnesses testified that had GreenStone been aware of the Synergy Feeds debt, approval of the loan would have required a guaranty by a FSA, minimizing GreenStone's loss to approximately $50,000, as opposed to the present $900,000. Therefore, given that GreenStone followed the industry standard in its underwriting and approval process, the court finds that GreenStone reasonably relied on the financial statements that Mr. Vander Hoff uttered, which omitted the Synergy Feeds debt and mortgage.

Turning, now, to Mr. Vander Hoff's alleged intent to deceive, caselaw within our Circuit teaches that "gross recklessness is sufficient to establish an intent to deceive"—the fourth requirement of § 523(a)(2)(B). *Woolum*, 979 F.2d at 73 (citing *In re Martin*, 761 F.2d 1163, 1167 (6th Cir.1985)) ("The standard ... is that if the debtor either intended to deceive the Bank or acted with gross recklessness, full discharge will be denied.").

Here, Mr. Vander Hoff naturally testified that he did not intend to omit the Synergy Feeds debt when completing and executing the loan documents associated with the loan the Dairy received from GreenStone. Given the proximity in time between the securing of that debt with a

mortgage and the final execution of the GreenStone loan documents a few weeks later, however, his testimony in this regard is not credible.  Moreover, Mr. Vander Hoff did acknowledge that he was aware of the debt at the time that he executed the documents and even agreed that the omission of the Synergy Feeds debt and mortgage was "a big deal."  This admission, coupled with the fact that Mr. Vander Hoff is a seasoned dairyman who signed the note and mortgage for the Synergy Feeds debt just weeks prior to finalizing the GreenStone loan, at the very least leads the court to find that Mr. Vander Hoff was grossly reckless in his omission, and thus intended to deceive GreenStone within the meaning of § 523(a)(2)(B).

### III. CONCLUSION AND ORDER

After evaluating the totality of the circumstances, and based on the preponderance of the evidence, the court finds in favor of GreenStone: GreenStone reasonably relied on the financial statements when agreeing to make the Dairy's loan and Mr. Vander Hoff intended to deceive GreenStone in obtaining the loan.  The other elements of GreenStone's case having been established by pretrial stipulation, the court will enter judgment in GreenStone's favor, declaring the debt represented by the Judgment to be excepted from discharge under § 523(a)(2)(B).

NOW, THEREFORE, IT IS HEREBY ORDERED that the Clerk shall enter a judgment conforming to the court's Findings of Fact and Conclusions of Law.

IT IS FURTHER ORDERED that the Clerk shall serve a copy of these Findings of Fact and Conclusions of Law pursuant to Fed. R. Bankr. P. 9022 and LBR 5005-4 upon Alexander Joseph Berry-Santoro, Esq., and John W. Polderman, Esq.

END OF ORDER

**IT IS SO ORDERED.**

**Dated January 26, 2023**



Scott W. Dales
United States Bankruptcy Judge